1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAKSIM ZAITSEV,<br><br>                         Petitioner,<br><br>     v.<br><br>WARDEN, Adelanto ICE Processing Center, in his/her official capacity; ERNESTO JR SANTACRUZ, Acting Field Office Director for Immigration and Customs Enforcement and Removal Operation, U.S. Immigration and Custom Enforcement (Los Angeles Field Office); TODD M. LYONS, Acting Director of U.S. Immigration and Customs Enforcement; KRISTI NOEM, Secretary of U.S. Department of Homeland Security; and THE ATTORNEY GENERAL OF THE UNITED STATES AND THE SENIOR OFFICIAL OF THE U.S. DEPARTMENT OF JUSTICE, (DOJ),<br><br>                       Respondents. | Case No. 2:26-cv-00454-SPG-AS<br><br>**ORDER DENYING PETITIONER'S APPLICATION FOR A TEMPORARY RESTRAINING ORDER [ECF NO. 1-3]** |

Petitioner Maksim Zaitsev ("Petitioner") is a Russian national detained at the United States Immigrations and Customs Enforcement ("ICE") Processing Center in Adelanto, California. *See* (ECF No. 1 ("Petition")). On January 15, 2026, Petitioner filed a Petition for a Writ of Habeas Corpus, challenging his continued detention under the Constitution's Due Process Clause, 8 U.S.C. § 1226, and the Department of Homeland Security's implementing regulations. *See* (*id.* at 13–14). On the same day, Petitioner filed an application for a temporary restraining order, requesting either his immediate release from custody or a bond hearing. *See* (ECF No. 1-3 ("Application") at 7). As discussed below, Petitioner has not shown that he is likely to succeed on the merits of his claims and, therefore, the Court DENIES the Application without prejudice to re-filing at a later date.

## I.    BACKGROUND

Petitioner arrived in the United States approximately three years ago. *See* (Petition at 10–11). He entered the Country through Mexico, seeking asylum based on a fear of persecution due to his political opposition to Russia's war in Ukraine. *See* (*id.* at 4, 10–11). According to the Petition, upon entering the United States, Petitioner "affirmatively presented himself to U.S. authorities to obtain lawful protection and immigration status." (*Id.* at 3). On April 3, 2023, the Government mailed Petitioner a Notice to Appear, notifying Petitioner that the Government had commenced removal proceedings. *See* (ECF No. 8-1, Ex. 1). The Notice to Appear asserted that Petitioner is an "arriving alien," subject to removal pursuant to § 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act ("INA"). *See* (*id.*); *see* 8 U.S.C. § 1182(a)(7)(A)(i)(I) (immigrants who, at the time of their application for admission, lack a valid entry document are inadmissible). However, the Government did not enter a final order of removal against Petitioner, and Petitioner remained free from detention. *See* (ECF No. 8 ("Opposition") at 6).

Petitioner subsequently received a notice from ICE, directing him to report with his wife to an ICE field office in Downtown Los Angeles on February 25, 2025. *See* (Petition at 11). After arriving at the field office with his wife, Petitioner, who communicates in the Russian language, was presented with an administrative arrest warrant written in English,

and two Deportation Officers, Officers Robles and Hisle, initiated Petitioner's arrest by placing handcuffs on Petitioner. *See* (*id.*); *see also* (ECF No. 1-3, Ex. A, at 12–13). As Petitioner was being led away in handcuffs, Petitioner began yelling to his wife in Russian. *See* (*id.* at 13). Officers Robles and Hisle began "brutally assault[ing]" Petitioner, "attempt[ing] to force Petitioner's sweatshirt hood into his mouth causing him to struggle for air." (Petition at 11). Petitioner bit down on Officer Robles's pinky finger, fracturing it. *See* (*id*); *see also* (ECF No. 1-3, Ex. A, at 13). Officers Robles and Hisle punched Petitioner on the head and face multiple times, resulting in Petitioner sustaining multiple lacerations to his head and face. *See* (ECF No. 1-3, Ex. A, at 13–14).

Following Petitioner's arrest, the Government brought criminal charges against Petitioner for assaulting a federal employee. *See* Complaint, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 1 (C.D. Cal. Feb. 25, 2025); Indictment, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 13 (C.D. Cal. Mar. 7, 2025). In connection with the criminal action, Petitioner was initially placed in criminal pre-trial detention. *See* Minutes of Detention Hearing, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 15 (C.D. Cal. Mar. 11, 2025). However, on April 2, 2025, this Court ordered Petitioner's release on bond, finding Petitioner did not pose a flight risk or danger to the community. *See* Amended Minutes, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 32 (C.D. Cal. Apr. 2, 2025). Thereafter, Petitioner was released from pre-trial custody on April 4, 2025. *See* Bond and Conditions of Release, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 37 (C.D. Cal. Apr. 4, 2025). However, he was detained by the Department of Homeland Security ("DHS") on the same day. *See* (Opp. at 6); *see also* (ECF No. 8-2, Ex. 2). On April 30, 2025, Petitioner was brought before an immigration judge ("IJ") for a bond hearing. *See* (ECF No. 8-4, Ex. 4). The IJ concluded that Petitioner is an "arriving alien" and, therefore, the IJ did not have jurisdiction to make a custody redetermination. *See* (*id.*).

In the criminal action, Petitioner entered a plea of not guilty and asserted the possibility of proceeding on a self-defense theory. *See* (ECF No. 1-3, Ex. A, at 14). On

May 14, 2025, just six days before the criminal action was scheduled to begin trial, Petitioner appeared for a pre-trial hearing on a motion *in limine* filed by the Government, seeking to preclude the introduction of evidence from Officer Hisle's and Officer Robles's employee personnel files.  *See* (*id.* at 14).  Following the hearing, Federal Protective Service Special Agent ("SA") Thomas Smith transported Petitioner from the First Street Federal Courthouse in Downtown Los Angeles to an ICE holding facility in Downtown Los Angeles.  *See* (*id.*).  According to SA Smith, after SA Smith notified the ICE holding facility via its intercom system of Petitioner's return, Officer Hisle came to the entrance and received Petitioner from SA Smith.  *See* (*id.* at 14–15).  While processing Petitioner back into custody, Officer Hisle confronted Petitioner, asked if Petitioner remembered him (from the day of Petitioner's arrest on the administrative warrant), then took off his face covering and repeated the question.  *See* (*id.* at 15–16).  During the confrontation, Officer Hisle, who is six feet tall and weighs approximately 230 pounds, came within six inches of Petitioner's face and pointed his finger near Petitioner's face.  *See* (*id.* at 20–21).  Thereafter, Officer Hisle lingered in the area while Petitioner was being processed and later pumped his clenched fist in the air while looking in Petitioner's direction as Petitioner looked in the direction of Officer Hisle.  *See* (*id.*).

On May 17, 2025, Petitioner moved to dismiss the indictment for government misconduct.  *See* Motion to Dismiss Indictment for Government Misconduct, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 91 (C.D. Cal. May 17, 2025).  In the motion, Petitioner argued that Officer Hisle and the Government, through Officer Hisle, violated Petitioner's right to due process, as Officer Hisle's conduct placed Petitioner in fear and discouraged Petitioner from testifying during trial in his own defense.  *See generally* (*id.*).

On May 19, 2025, the Court held an evidentiary hearing.  *See* Minutes, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 97 (C.D. Cal. May 19, 2025).  During the hearing, the Defense called Officer Hisle to the stand and questioned him regarding his actions on May 14, 2025, toward Petitioner at the ICE holding facility.  *See* (ECF No. 1-3, Ex. A, at 19–20).  Officer Hisle testified that his tone was calm when interacting with

Petitioner and that he did not engage in any intimidating or threatening behavior.  *See* (*id.* at 26).  The Defense introduced a letter written by Officer Hisle to his supervisor, which stated that at no time during Officer Hisle's interaction with Petitioner on May 14, 2025, did Officer Hisle "make any implied, explicit, coercive, intimidating statements or make any threatening physical gestures or threats of any kind."  (*Id.* at 17).  The defense, however, also introduced two surveillance videos taken at the ICE detention facility on May 14, 2025, which captured Officer Hisle confronting Petitioner at a close distance, Officer Hisle pointing his finger in Petitioner's face, and Officer Hisle pumping his clenched fist in the air in the direction of Petitioner.  *See* (*id.* at 17, 21).

When questioned about the letter he wrote to his supervisor, Officer Hisle admitted that he omitted information from the letter.  *See* (*id.* at 20).  When questioned about the surveillance video, Officer Hisle admitted that he came within six inches of Petitioner's face when he asked Petitioner more than once if Petitioner remembered Officer Hisle, and Officer Hisle admitted that he pumped his clenched fist in the air while looking in the direction of Petitioner.  *See* (*id.* at 20–21).  Officer Hisle, however, did not explain why he approached Petitioner, why he asked if Petitioner remembered him, or why he raised his clenched fist in Petitioner's direction.  *See* (*id.* at 27–28).  The Government elected not to ask any questions of Officer Hisle and did not call as witnesses other officers who were within earshot of Officer Hisle's encounter with Petitioner.  *See* (*id.* at 28–30).

The Defense also called Petitioner to the stand, who testified that he did not understand what Officer Hisle said to him in English in the ICE holding facility, but he understood the word "remember" and perceived Officer Hisle's tone to be rude and threatening.  *See* (*id.* at 22).  Petitioner further testified that because of the encounter, he feared that ICE officers would retaliate against him if he testified at trial.  *See* (*id.* at 22–23).  The Government elected not to cross-examine Petitioner.  *See* (*id.* at 23).

On May 20, 2025, the Court dismissed the indictment in the criminal action, concluding that Officer Hisle's conduct amounted to substantial Government interference with Petitioner's free and unhampered decision whether to testify in his own defense.  *See*

(*id.* at 31). In reaching this conclusion, the Court considered both Officer Hisle's actions on February 25, 2025, and May 14, 2025. *See* (*id.*). The Court concluded that Officer Hisle had acted in a threatening and intimidating manner toward Petitioner, based on Officers Hisle and Robles previously beating Petitioner on the day of Petitioner's administrative arrest, Petitioner's testimony about Officer Hisle's threatening tone when he confronted Petitioner in ICE custody, and video footage showing Officer Hisle's intimidating stance and demeanor during the confrontation. *See* (*id.* at 25–27). The Court determined based on the admitted evidence that Officer Hisle's testimony that he did not engage in any intimidating or threatening behavior towards Petitioner was not credible. *See* (*id.* at 26–27). Additionally, the Court found the Government failed to rebut Petitioner's testimony that he was fearful and discouraged by Officer Hisle's actions from testifying in Petitioner's own defense during trial. *See* (*id.* at 37). Based on the evidence presented, the Court found that Officer Hisle's conduct violated Petitioner's due process rights and was attributable to the Government, as Officer Hisle was a central witness to both the Government's case and Defendant's possible arguments as to self-defense. *See* (*id.* at 25–26). The Court also found that, even if Officer Hisle's conduct fell short of a due process violation, his conduct justified dismissal under the Court's supervisory powers. *See* (*id.* at 35–41); *see also United States v. Chapman*, 524 F.3d 1073 (9th Cir. 2008).[1]

Notwithstanding the Court's dismissal of the criminal indictment, Petitioner remained in ICE custody. *See* (Petition at 2). On July 15, 2025, Petitioner received a bond hearing, *see* (ECF No. 8-5, Ex. 5), but as with Petitioner's first bond hearing before an IJ, the presiding IJ for the second bond hearing concluded that he lacked jurisdiction to order Petitioner released on bond. *See id.* Specifically, the IJ checked boxes on his order

---

[1] On June 23, 2025, the Government appealed from this Court's order dismissing the indictment. *See* Notice of Appeal, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 104 (C.D. Cal. May 19, 2025). The government, however, moved to voluntarily dismiss that appeal, which was subsequently granted on July 15, 2025. *See* Ninth Circuit Order, *United States v. Zaitsev*, 2:25-cr-00154-SPG-1, ECF No. 106 (C.D. Cal. July 15, 2025).

representing the reasons for the denial were that Petitioner was an "arriving alien," Petitioner did not fall within a class of detainees that had been detained for over 180 days, and there was no change in circumstances since the prior bond hearing.  *See* (*id.*).

Approximately four months later, on November 14, 2025, Petitioner received a bond hearing pursuant *Rodriguez v. Holder*, No. 07-cv-3239-TJH-RNBx, 2013 WL 5229795 (C.D. Cal. Aug. 6, 2013), *aff'd in part*, *rev'd in part sub nom. Rodriguez v. Robbins*, 804 F.3d. 1060, 1086 (9th Cir. 2015), *rev'd sub nom. Jennings v. Rodriguez*, 583 U.S. 281 (2018) (hereinafter, "*Rodriguez*").  According to the IJ's order denying bond, "the Court considered [Petitioner's] request for bond" and determined that "DHS met its burden to establish by clear and convincing evidence that [Petitioner's] release would pose such a significant flight risk that no amount of bond and/or alternatives to detention would be appropriate." *See* (ECF No. 8-6, Ex. 6 ("3rd Bond Order")).  A copy of the 3rd Bond Order was subsequently served on Petitioner. *See* (*id.*).  The record does not reflect that Petitioner filed an appeal of the 3rd Bond Order to the Board of Immigration Appeals ("BIA").  According to a declaration submitted by Respondents, following the 3rd Bond Order, the IJ "reset the matter to February 12, 2026, for the issuance of an oral decision on all relief before [the Executive Office for Immigration Review]."  (ECF No. 8-7, Declaration of Alfredo Jose Bonilla).

On January 15, 2026, Petitioner filed the instant Petition and Application.  The Petition names as Respondents, in their official capacities, Warden, Adelanto ICE Processing Center; Ernesto Santacruz, Jr., Acting Field Office Director, Enforcement and Removal Operations, ICE Los Angeles Field Office; Todd M. Lyons, Acting Director, ICE; Kristi Noem, Secretary, DHS; and Pamela Bondi, Attorney General, United States Department of Justice ("Respondents").  *See* (Petition at 1, 9–10).  Respondents filed a brief in opposition on January 28, 2026, *see* (Opp.), and Petitioner filed a brief in reply on January 30, 2026, *see* (ECF No. 9 ("Reply")).

On February 4, 2026, the Court held a hearing on the Application.  During the hearing, counsel for Respondents requested to show the Court and counsel for Petitioner at

sidebar the exhibits Respondents' counsel represented were in the record before the IJ when, on November 14, 2025, the IJ issued the 3rd Bond Order denying Petitioner bond. *See* (ECF No. 159, Bonilla Declaration re: Sidebar and Question of Law or Fact, ¶¶ 4–8). Counsel for Petitioner stated Petitioner had no objection to the Court reviewing the records.

At side bar, counsel for Respondents presented to the Court and counsel for Petitioner what counsel for Respondents represented to be an electronic copy of the administrative record for the Petitioner's third bond hearing. *See* (*id.* ¶ 7). Although it is unclear from the 3rd Bond Order what the IJ specifically considered in denying bond, the documents shown to the Court and counsel for Petitioner reflect that the documents in the record before the IJ included a declaration filed by Petitioner's defense counsel in the criminal case discussing the Court's dismissal of the indictment and exhibits to the declaration, including pictures showing Petitioner's injuries after his administrative arrest on February 25, 2025, and showing Petitioner wearing a sweatshirt with what appears to be stains from an unknown liquid located on the hood of his sweatshirt.

Following the hearing, on February 6, 2025, counsel for Respondents submitted a declaration attesting to the documents submitted as exhibits during Petitioner's third bond hearing. *See* (*id.*). According to the declaration, the IJ admitted eight exhibits during Petitioner's third bond hearing. (*Id.* ¶ 18). As counsel for Respondents represented during the Court's February 4, 2025, hearing, counsel's declaration attests that defense counsel in the criminal case submitted a declaration in support of Petitioner's release on bond discussing the criminal case. *See* (*id.* ¶ 13). Petitioner's former criminal defense attorney attached as exhibits to her declaration "high-resolution color photographs of Petitioner's injuries" and the "full transcript of the May 20, 2025 hearing on the motion to dismiss the federal criminal case – including the Court's ruling of dismissal with prejudice." (*Id.*). Counsel for Respondents also attests that the IJ admitted several other documents as exhibits, including a photograph and an X-ray of the injury to Officer Robles's finger and an internal DHS document titled "Memo re: Assault on Deportation Officer." *See* (*id.* ¶¶ 14, 15).

## II.    LEGAL STANDARD

A temporary restraining order is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The standard for issuing a temporary restraining order is essentially the same as that for issuing a preliminary injunction. *See Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) ("[T]he legal standards applicable to TROs and preliminary injunctions are substantially identical." (internal quotation marks and citation omitted)). A plaintiff may secure a temporary restraining order upon establishing that: (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *See Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012) (citing *Winter*, 555 U.S. at 20).

"[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (internal quotation marks omitted). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)). "'In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

The court is permitted to consider the parties' pleadings, declarations, affidavits, and exhibits submitted when deciding an application for a temporary restraining order. *See Earth Island Inst. v. Nash*, No. 1:19-cv-01420-DAD-SAB, 2020 WL 1936701, at *6 (E.D. Cal. Apr. 21, 2020) ("[I]n considering a motion for preliminary injunction, a court may consider and rely upon declarations, affidavits, and exhibits submitted by the parties."

1  (citations omitted)); *Harper v. Poway Unified Sch. Dist.*, 345 F. Supp. 2d 1096, 1119–20

2  (S.D. Cal. 2004) (considering declarations submitted by defendants to deny plaintiff's

3  request for a preliminary injunction). "The trial court may give even inadmissible evidence

4  some weight, when to do so serves the purpose of preventing irreparable harm before trial."

5  *Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984). The urgency of

6  the relief sought necessitates a prompt determination and can make it difficult to obtain

7  admissible evidence. *See id.*

8  **III.  DISCUSSION**

9        At the outset, Respondents argue that the Court lacks jurisdiction to consider the

10  Application and Petition under 8 U.S.C. § 1252. *See* (Opp. at 14–19). Respondents also

11  argue that Petitioner is lawfully detained pursuant to 8 U.S.C. § 1226(a), already received

12  three bond hearings, and is not entitled to any additional process. *See* (*id.* at 19–20). As

13  discussed below, the Court determines that it has jurisdiction to consider the Application

14  but finds, based on the evidence and the arguments presented by Petitioner, that Petitioner

15  has not shown he is likely to succeed on the merits of his claims.

16        **A.   Jurisdiction**

17        Respondents argue that the Court lacks jurisdiction to consider the Petition under

18  8 U.S.C. § 1252. *See* (*id.* at 14–19). Respondents argue that 8 U.S.C. § 1252(g) strips the

19  Court's jurisdiction to adjudicate a petition for a writ of habeas corpus where an alien is

20  detained during the pendency of removal proceedings. *See* (*id.* at 14–16). Further,

21  according to Respondents, under 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9), Petitioner can

22  only challenge his detention "before the appropriate federal court of appeals in the form of

23  a petition for review of a final removal order." (*Id.* at 16–19). The Court will address each

24  argument in turn.

25        1.   Section 1252(g)

26        Pursuant to 8 U.S.C. § 1252(g), "[e]xcept as provided in this section and

27  notwithstanding any other provision of law (statutory or nonstatutory), including section

28  2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such

title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter."

In *Reno v. American-Arab Anti-Discrimination Commission* ("*AAADC*"), the Supreme Court instructed that § 1252(g) must be read narrowly to apply "only to three discrete actions that the Attorney General may take: 'her decision or action' to '[1] *commence* proceedings, [2] *adjudicate* cases, or [3] *execute* removal orders.'" *AAADC*, 525 U.S. 471, 482, 486 (1999) (quoting 8 U.S.C. § 1252(g)). Subsequently, in *Jennings v. Rodriguez*, the Court explained this provision should not be read "to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General." 583 U.S. 281, 294 (2018). Instead, § 1252(g) only restricts judicial review of the three specific actions listed. *See id.* Thus, "§ 1252(g) does not prohibit challenges to unlawful practices merely because they are in some fashion connected to removal orders." *Ibarra-Perez v. United States*, 154 F.4th 989, 997 (9th Cir. 2025); *see also Ozturk v. Hyde*, 136 F.4th 382, 397 (2d Cir. 2025) ("Section 1252(g) does not preclude jurisdiction over . . . challenges to the legality of [a] noncitizen's detention" (internal quotation marks and alterations omitted)); *Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999) (habeas petition "concern[ed] detention while the administrative process lasts" and so "may be resolved without affecting pending proceedings" under § 1252(g)).

Respondents do not argue that Petitioner challenges a decision to commence proceedings, adjudicate his case, or execute a removal order. *See id.* Instead, Respondents broadly interpret § 1252(g) as barring judicial review of "the decision to detain an alien pending removal." (Opp. at 15). However, Respondents' interpretation of § 1252(g) is directly counter to the Supreme Court's admonition that § 1252(g) should be read narrowly. *See AAADC*, 525 U.S. at 487; *see also Kong v. United States*, 62 F.4th 608, 616 (1st Cir. 2023) ("Construing the 'arising from' language of § 1252(g) to bar all detention-related claims . . . would raise serious constitutional concerns under the Suspension Clause."). Therefore, the Court concludes that § 1252(g) does not strip the Court's jurisdiction to

consider, on a petition for a writ of habeas corpus, a challenge to the legal basis for Petitioner's detention under the INA and the Fifth Amendment's Due Process Clause.

### 2.    Sections 1252(a)(5) and 1252(b)(9)

Next, Respondents argue that, under 8 U.S.C. §§ 1252(a)(5) and 1252(b)(9), Petitioner was required to bring this action in the court of appeals. *See* (Opp. at 16–19). Section 1252(a)(5) provides that, "[n]otwithstanding any other provision of law . . . a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal entered or issued under any provision of this chapter." 8 U.S.C. § 1252(a)(5). Section 1252(b)(9), meanwhile, states, "[j]udicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section." 8 U.S.C. § 1252(b)(9). Section 1252(b)(9) continues, "[e]xcept as otherwise provided in this section, no court shall have jurisdiction . . . to review such an order or such questions of law or fact." *Id.*

The Court finds §§ 1252(a)(5) and 1252(b)(9) inapplicable here. Section 1252(a) only provides for "judicial review of an order of removal entered or issued under any provision of this chapter." 28 U.S.C. § 1252(a)(5). Here, Respondents do not suggest that there is an order of removal in place, let alone that the Petition seeks review of such an order. Indeed, counsel for Respondents confirmed during the hearing on the Application that no such order had been issued. Therefore, § 1252(a)(5) is facially inapplicable. As to § 1252(b)(9), the Supreme Court has explained that this provision does not bar judicial review where the petitioner is "not asking for review of an order of removal; [is] not challenging the decision to detain them in the first place or to seek removal; and [is] not even challenging any part of the process by which their removability will be determined." *Jennings*, 583 U.S. at 294–95; *accord Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 20 (2020) ("§ 1252(b)(9) does not present a jurisdictional bar where

those bringing suit are not asking for review of an order of removal, the decision to seek removal, or the process by which removability will be determined." (internal quotation marks and ellipses omitted)).  Because Petitioner only challenges his continued detention pending a decision on his removal, § 1252(b)(9) does not apply.

**B.    Merits**

On the merits, Petitioner seeks relief on two grounds.  First, Petitioner argues that his detention violates 8 U.S.C. § 1226(a) and DHS's implementing regulations, because the IJ's 3rd Bond Order denying bond due to a "significant flight risk" was not supported by the evidence presented during his bond hearing.  *See* (Petition at 14); *see also* (Application at 4).  Petitioner also argues that his continued detention violates the Fifth Amendment's Due Process Clause, in light of officers' use of excessive force when he was initially arrested, his continued detention following dismissal of the criminal action, and the conditions of his confinement.  *See* (Petition at 13–14); *see also* (Application at 4).  For the reasons discussed below, Petitioner has not shown that he is likely to succeed on the merits of his claims.

1.    Section 1226

In the Application, Petitioner argues his "[c]ontinued detention after judicial release, and under abusive conditions, exceeds statutory authority and violates DHS detention standards." (Application at 4).  In the Petition, Petitioner also challenges the 3rd Bond Order denying his release on bond based on a finding that Petitioner poses a significant flight risk.  *See* (Petition at 4–7).  Petitioner argues that the IJ's flight risk determination "is not supported by substantial evidence" because Petitioner has "consistently complied with all government directives since his arrival in the United States" and, instead, "appears to rest on the impermissible assumption that noncitizens in removal proceedings are inherently flight risks." (*Id.* at 4–5).

In Opposition, Respondents argue that Petitioner is lawfully detained pursuant to 8 U.S.C. § 1226(a).  Respondents argue that § 1226(a) permits the Government to detain non-citizens during the pendency of removal proceedings and does not require the

Government to provide non-citizens with a pre-detention hearing. *See* (Opp. at 19). Respondents further argue that the Government has complied with § 1226(a)'s implementing regulations, as the Government has provided Petitioner with three bond hearings. *See* (*id.* at 20). In the first two hearings, the IJ determined that he "lacked jurisdiction to consider the Petitioner for bond because he is an arriving alien." (Opp. at 6). In the third hearing, the IJ provided Petitioner with a hearing where, under *Rodriguez*, "DHS bore the burden to justify continued detention by clear and convincing evidence." (Opp. at 6–7).

Based on the arguments and evidence presented, Petitioner has not shown a likelihood of success on the merits of his statutory claim. Pursuant to § 1226(a), "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Once detained, the Government has the "broad discretion," *Nielsen v. Preap*, 586 U.S. 392, 409 (2019), to either "continue to detain the arrested alien" or "release the alien on (A) bond of at least $1,500 . . . or (B) conditional parole," 8 U.S.C. § 1226(a)(1)–(2). In the first instance, the arresting officer makes the initial determination whether to release an alien detained under § 1226(a) on bond or parole. *See* 8 C.F.R. § 236.1(c)(8).

Following this initial custody determination, an alien may request a bond hearing before an IJ. *See* 8 C.F.R. §§ 236.1(d)(1), 1003.19. Under DHS regulations, an alien detained under § 1226(a) bears the burden of showing, by a preponderance of the evidence, that he does not pose a danger to the community and he is not a flight risk. *See* 8 C.F.R. § 1236.1(c)(8); *see also Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006); *Matter of Barreiros*, 10 I&N Dec. 536, 537 (BIA 1964).[2] In assessing whether to release an alien on

---

[2] In *Rodriguez v. Robbins*, the Ninth Circuit held that aliens detained under § 1226(a) are entitled to a bond hearing every six months at which the Government must prove, by clear and convincing evidence, that an alien's continued detention is justified. 804 F.3d 1060, 1085, 1087 (9th Cir. 2015); *see also Jennings v. Rodriguez*, 583 U.S. 281, 292 (2018). On appeal, the Supreme Court reversed the Ninth Circuit, concluding that § 1226(a) does not set out a statutory right to periodic bond hearings every six months at which the

bond, the IJ considers, among other factors, "the individual's ties to the United States as well as his employment history, criminal record, history of immigration violations, and manner of entry into this country." *See Rodriguez Diaz*, 53 F.4th at 1197 (citing *Guerra*, 24 I&N Dec. at 40); *see also Matter of E-Y-F-G*, 29 I&N Dec. 103, 104 (2025). An alien may appeal a bond denial to the BIA. *See* 8 C.F.R. § 236.1(d)(3). An alien may also request an additional bond hearing based on a material change in circumstances. *See* 8 C.F.R. § 1003.19(e).

By contrast to the framework set out in § 1226(a), certain aliens treated as "applicants for admission" are subject to mandatory detention. *See* 8 U.S.C. § 1225. "An alien present in the United States who has not been admitted or who arrives in the United States" is considered "an applicant for admission." 8 U.S.C. § 1225(a)(1). Under § 1225(b)(1), "an applicant for admission 'initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation' is 'normally ordered removed without further hearing or review pursuant to an expedited removal process.'" *Rodriguez Diaz*, 53 F.4th at 1197 (quoting *Jennings*, 583 U.S. 281, 287 (2018)). If such an alien applies for asylum, the alien "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C.

---

Government must justify an alien's continued detention. *See Jennings*, 583 U.S. at 306. Subsequently, in *Rodriguez Diaz v. Garland*, the Ninth Circuit found that the Government did not violate a petitioner's right to due process by requiring the petitioner to bear the burden of proof in a § 1226(a) bond hearing. 53 F.4th 1189, 1212 (9th Cir. 2022). The court explained that "[n]othing in [the] record suggests that placing the burden of proof on the government was constitutionally necessary to minimize the risk of error, much less that such burden-shifting would be constitutionally necessary in all, most, or many cases." *Id.* Here, during the third bond hearing, the IJ determined the government had demonstrated Petitioner was a flight risk by clear and convincing evidence. *See* (3rd Bond Order). Beyond that finding, there is no discussion in the 3rd Bond Order of who bore the burden of proof of the appropriate legal standard to be applied. Regardless, Petitioner does not challenge the legal standard applied during the third bond hearing; instead, Petitioner argues the evidence was not sufficient for the IJ to determine that Petitioner poses a flight risk.

§ 1225(b)(1)(B).  All other applicants for admission "shall be detained" pending removal proceedings, unless the examining immigration officer determines that the alien is "clearly and beyond a doubt entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A).

Under the federal regulation implementing the INA, "an applicant for admission coming or attempting to come into the United States at a port-of-entry" is considered to be an "arriving alien," and such an individual "remains an arriving alien even if paroled" into the United States.  8 C.F.R. § 1001.1(q).  "[A]ny arriving alien who appears to the inspecting officer to be inadmissible, and who is placed in removal proceedings pursuant to section 240 of the Act shall be detained in accordance with section 235(b) of the Act," codified at 8 U.S.C. § 1225(b)."  8 C.F.R. § 235.3(c).  Immigration judges "may not redetermine conditions of custody imposed by [DHS]" with respect to "[a]rriving aliens in removal proceedings, including aliens paroled [into the United States] after arrival."  8 C.F.R. § 1003.19(h)(2)(i)(B).

Petitioner received two initial bond hearings in which the same IJ determined that he was an "arriving alien" and concluded that he lacked authority to determine Petitioner's release on bond.  *See* (ECF No. 8-4, Ex. 4; ECF No. 8-5, Ex. 5).  In Petitioner's third bond hearing, the IJ considered Petitioner's request for bond under § 1226(a) and determined that Petitioner's release "would pose such a significant flight risk that no amount of bond and/or alternatives to detention would be appropriate."  (3rd Bond Order).  Petitioner's statutory challenge to his continued detention is based upon the IJ's determination in his third bond hearing that Petitioner poses a flight risk.  *See* (Petition at 4–6).  Petitioner does not challenge his continued detention based on the IJ's determination in the initial two bond hearings that the IJ lacked jurisdiction to consider Petitioner's request for release on bond, as an arriving alien.  *See generally* (*id.*).

At the outset, the Court must determine whether it has jurisdiction to review the IJ's determination that Petitioner poses a flight risk.  Section 1226(e) states:

The Attorney General's discretionary judgment regarding the application of [§ 1226] shall not be subject to review.  No court may set aside any action or

decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

8 U.S.C. § 1226(e).  In *Martinez v. Clark*, the Ninth Circuit reviewed a district court's denial of a habeas petition challenging the BIA's determination that the petitioner posed a danger to the community and a flight risk.  36 F.4th 1219 (9th Cir. 2022).  On review, the court held that "the determination of whether a particular noncitizen poses a danger to the community is a discretionary determination, which a federal court may not review." *Id.* at 1228.  In support, the court relied on 8 U.S.C. § 1226(e).  *See id.* at 1226–28.

On review, the Supreme Court vacated the Ninth Circuit's decision, in light of *Wilkinson v. Garland*, 601 U.S. 209 (2024).  *See Martinez v. Clark*, 144 S. Ct. 1339 (2024). In *Wilkinson*, the Supreme Court considered whether judges can review an IJ's determination that an alien's removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child.  *See Wilkinson*, 601 U.S. at 213, 217; *see also* 8 U.S.C. § 1229b(b).  In its analysis, the Court addressed the interplay between 8 U.S.C. § 1252(a)(2)(B)(i), which strips courts of jurisdiction to review judgments regarding the granting of discretionary relief in the form of cancellation of removal, and 8 U.S.C. § 1252(a)(2)(D), which restores judicial review of "constitutional claims or questions of law." *See id.* at 218–21.  The Court explained that § 1252(a)(2)(B)(i) precludes judicial review of an IJ's "underlying factual determination[s]," *id.* at 222, but not the determination "whether those established facts satisfy the statutory eligibility standard" for cancellation of removal, *id.* at 225.  The Court reasoned that § 1252(a)(2)(D) empowers courts to review "questions of law" and that "[m]ixed questions of law and fact, even when they are primarily factual, fall within the statutory definition of 'questions of law' in § 1252(a)(2)(D) and are therefore reviewable." *Id* at 225.

On remand in *Martinez v. Clark*, the Ninth Circuit concluded that, in light of *Wilkinson*, "the determination of whether an alien is 'dangerous' for immigration-detention purposes is a mixed question of law and fact and is reviewable as a 'question of law.'" 124

F.4th 775, 779 (9th Cir. 2024).  The court explained that § 1226(e) "restricts jurisdiction only with respect to the executive's exercise of discretion but that discretionary judgment does not include constitutional claims or questions of law."  *Id.* at 781–82 (quoting *Singh v. Holder*, 638 F.3d 1196, 1202 (9th Cir. 2011)).  The court then determined that the BIA's determination of dangerousness, as assessed against the backdrop of nine factors that IJs consider under BIA precedent in assessing whether an alien presents a flight risk or a danger to the community, constitutes a mixed question of fact and law, rather than a discretionary determination.  *See id.* at 783–84; *see also Guerra*, 24 I&N Dec. at 40 (setting out nine factors an IJ may consider).  The court further determined that "questions [that] require a close review of agency-found facts," such as the determination whether an alien is "dangerous" for purposes of release on bond, are subject to review for abuse of discretion.  *Martinez*, 124 F.4th at 784.

In addressing the abuse of discretion standard, the Ninth Circuit stated that courts may not "reweigh evidence but can only determine whether the BIA applied the correct legal standard."  *Id.* at 785 (internal ellipses and alterations omitted).  The court further stated that, "[g]enerally, in the absence of any red flags, we take the BIA at its word."  *Id.* As examples, the court explained that, "[w]hen nothing in the record or the BIA's decision indicates a failure to consider all the evidence, we will rely on the BIA's statement that it properly assessed the entire record."  *Id.*  (internal quotation marks omitted).  Similarly, the court wrote that the BIA is not required to "discuss each piece of evidence submitted" and, when the BIA expressly cites and applies the relevant caselaw in its decision, courts should accept that the BIA applied the correct legal standard.  *See id.*  However, the court noted that, "when there is an indication that something is amiss," such as where the BIA misstates the record or fails to mention probative evidence, courts should not "credit [the BIA's] use of a 'catchall phrase' to the contrary."  *Id.*

In reviewing the BIA's determination, the *Martinez* court found that the BIA properly considered the factors set out in BIA precedent and did not abuse its discretion by finding that the petitioner posed a danger to the community.  *See id.*  The court explained

that the BIA relied on "the totality of the evidence" to determine that the petitioner's narcotics convictions provided compelling evidence that the petitioner was a danger to the community. *See id.* The court then noted that the BIA "reasonably believed" that evidence of the petitioner's rehabilitative efforts and recent compliance with the law did not outweigh the evidence that the petitioner posed a danger to the community. *See id.*

In light of *Martinez*, courts may review an IJ's finding that an alien poses a flight risk for abuse of discretion. *See C.A.R.V. v. Wofford*, No. 1:25-CV-01395-JLT-SKO, 2026 WL 241823, at *6 (E.D. Cal. Jan. 29, 2026); *Y.S.G. v. Andrews*, No. 2:25-CV-1884-SCR, 2025 WL 2979309, at *8–11 (E.D. Cal. Oct. 22, 2025); *Anyanwu v. Bondi*, No. C25-995-JLR-MLP, 2025 WL 3466910, at *4–5 (W.D. Wash. Oct. 6, 2025). However, where a petitioner denied bond under § 1226(a) does not exhaust his administrative remedies by appealing to the BIA, "a district court ordinarily should either dismiss the petition without prejudice or stay the proceedings until the petitioner has exhausted remedies, unless exhaustion is excused." *Leonardo v. Crawford*, 646 F.3d 1157, 1160 (9th Cir. 2011). In the context of a habeas petition, exhaustion is a prudential requirement. *See Laing v. Ashcroft*, 370 F.3d 994, 1000 (9th Cir. 2004). A court may waive the exhaustion requirement on a habeas petition if "administrative remedies are inadequate or not efficacious, pursuit of administrative remedies would be a futile gesture, irreparable injury will result, or the administrative proceedings would be void." *Id.* Petitioner bears the burden of showing that an excuse for exhaustion applies. *See Leonardo*, 646 F.3d at 1161.

Here, in the Petition and the Application, Petitioner has not raised any argument for why the Court should waive the prudential exhaustion requirement. Moreover, even if Petitioner is excused from exhausting his challenge to the IJ's determination, Petitioner has not shown that he is likely to succeed on the merits of his statutory challenge. As discussed above, courts may not "reweigh [the] evidence" on a challenge to an IJ's bond determination and may "only determine whether the [IJ] applied the correct legal standard." *Martinez*, 124 F.4th at 785 (internal alterations omitted). From the Court's review of the record, the 3rd Bond Order indicates that the IJ required the Government to bear the burden

of proof by clear and convincing evidence when making his flight risk determination. Thus, the IJ held the Government to a higher standard than that set out in BIA regulations, *see* 8 C.F.R. § 1236.1(c)(8), and the same standard or higher than what the Constitution requires, *see Rodriguez Diaz*, 53 F.4th at 1212. Further, Petitioner does not challenge whether the IJ applied the factors set forth in *Guerra*. Instead, Petitioner argues that the IJ did not sufficiently credit evidence of Petitioner's compliance with "government directives since his arrival in the United States." (Petition at 4); *see also* (Reply at 2–3 (arguing IJ's flight risk determination was unsound because Petitioner's appearance at immigration court proceedings presents "the strongest possible evidence against flight risk")). Thus, Petitioner's challenge to the 3rd Bond Order falls outside the scope of what this Court may review for abuse of discretion. *See Martinez*, 124 F.4th at 785.

### 2. Due Process

Petitioner further challenges his continued detention under the Fifth Amendment's Due Process Clause. *See* (Application at 4–5); *see also* (Petition 13–14). In support, Petitioner argues that, "[b]ecause the bond denial rests on an unsupported and irrational flight-risk finding, [Petitioner's] continued detention violates the Due Process Clause." (Petition at 7). Petitioner also argues that he is not a danger to the community or a flight risk and, thus, his "continued detention is punitive rather than regulatory." (*Id.* at 6).

In Opposition, Respondents argue that Petitioner has already received three bond hearings, and "no more process is due to him." (Opp. at 20).

In his Reply, Petitioner submits the following allegations as evidence that his continued detention is retaliatory. First, Petitioner argues that the IJ disproportionately relied on the accusations against him in the criminal case in denying his request for release on bond, instead of considering "immigration factors." (Reply at 4). Second, Petitioner contends that ICE denied him access to medical care until his counsel intervened. *See* (*id.*). Third, Petitioner claims that he has been treated in a hostile manner while detained, including through instances in which he was restrained with "excessive chains around [his] body," "held in an ice-cold room for extended periods," and subject to "taunting

statements" by immigration officials.  *See* (*id.*).  Petitioner does not specify in his Petition, the Application, or his Reply whether he is challenging his continued detention as a violation of procedural due process or substantive due process.

As presented, Petitioner has failed to show a likelihood of success on the merits of his due process claim.  Insofar as Petitioner seeks relief on procedural due process grounds, the Court looks to the Ninth Circuit's decision in *Rodriguez Diaz*.  In *Rodriguez Diaz*, the Ninth Circuit considered whether, following an initial denial of bond, the requirements of procedural due process entitled an alien to a second bond hearing at which the Government must bear the burden of proof by clear and convincing evidence.  *See* 53 F.4th at 1203.  In that case, the petitioner was taken into ICE custody following his release from criminal custody.  *See id.* at 1194.  Approximately two months later, the petitioner received an initial bond hearing, and an IJ denied the petitioner's release on bond on the ground that the petitioner posed a danger to the community.  *See id.*  Roughly a year later, the petitioner requested a second bond hearing.  *See id.* at 1195.  However, an IJ denied the petitioner's request, based on the petitioner's failure to show materially changed circumstances.  *See id.*  The petitioner then filed suit, and the district court granted the petitioner's request for a second bond hearing, at which the government had the burden of proof.  *See id.*  Following the district court's order, the IJ conducted a new hearing and released the petitioner on bond.  *See id.*

On review, the Ninth Circuit applied the balancing test set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976), to determine whether the petitioner had been deprived of due process.  *See Rodriguez Diaz*, 53 F.4th at 1205–10.  Under *Mathews*, courts consider three factors to determine "the specific dictates of due process": (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  *Mathews*, 424 U.S. at 335.

1      The Ninth Circuit concluded that the first factor weighed in the petitioner's favor, as
2  the petitioner had been detained for fourteen months since he received his initial bond
3  hearing.  *See Rodriguez Diaz*, 53 F.4th at 1207.  However, the court noted that "it is
4  important not to overstate the strength of [the petitioner's] showing under the first *Mathews*
5  factor."  *Id.*  The court explained that, in evaluating the petitioner's interest, it could not
6  "simply count his months of detention and leave it at that."  *Id.* at 1208.  Instead, the court
7  noted that it was also required to consider "the process he received during [his time in
8  detention], the further process that was available to him, and the fact that his detention was
9  prolonged due to his decision to challenge his removal order."  *Id.*

10      The Ninth Circuit next concluded that the Government had a significant
11  countervailing interest.  *See id.* at 1209.  The court began by emphasizing the political
12  branches' broad power to regulate immigration, noting that the breadth of Congress's
13  authority was especially sweeping "when it comes to determining whether removable
14  aliens must be released on bond during the pendency of removal proceedings."  *Id.* at 1208.
15  The court explained that, "[t]hrough detention, the government . . . seeks to increase the
16  chance that, if ordered removed, . . . aliens will be successfully removed."  *Id.* (internal
17  quotation marks and alterations omitted).  The court then reasoned that the Government's
18  interest in detaining aliens pending a decision on removal "only increase[s] with the
19  passage of time," concluding that that "[t]he risk of a detainee absconding . . . inevitably
20  escalates as the time for removal becomes more imminent."  *Id.* at 1208.

21      Finally, the Ninth Circuit found "that the existing agency procedures sufficiently
22  protected [the petitioner's] liberty interest and mitigated the risk of erroneous deprivation."
23  *Id.* at 1209.  The court noted that, pursuant to § 1226(a) and its implementing regulations,
24  ICE was required to make an individualized custody determination upon the petitioner's
25  arrest, the petitioner was entitled to a bond hearing before an IJ, and the petitioner was
26  entitled to request a second bond hearing based on a showing of changed circumstances.
27  *See id.*  The court further noted that, at his bond hearing, the petitioner was able to present
28  evidence that may bear on the IJ's determination and had the right to appeal the IJ's

1   decision to the BIA. *See id.* The court thus found that the statutory and regulatory

2   framework governing detention under § 1226(a) "ensured that the risk of erroneous

3   deprivation would be relatively small." *Id.* (internal quotation marks omitted).

4       In light of the Ninth Circuit's analysis in *Rodriguez Diaz*, Petitioner has not shown

5   that he is likely to succeed on the merits of a procedural due process claim. Petitioner has

6   been in immigration detention since April 2025 and, thus, "has a legitimate and reasonably

7   strong private liberty interest under *Mathews*." *Rodriguez Diaz*, 53 F.4th at 1207.

8   However, Petitioner received a bond hearing three months ago, and an IJ determined that

9   he poses a "significant flight risk." (3rd Bond Order). Thus, "it is important not to

10  overstate the strength of [Petitioner's] showing under the first *Mathews* factor." *Rodriguez*

11  *Diaz*, 53 F.4th at 1207 (noting that prior Ninth Circuit decisions addressing "prolonged

12  detention" largely addressed "detentions for which no individualized bond hearings had

13  taken place"). On the other hand, the Government has a "significant" countervailing

14  interest in cases addressing whether an alien "must be released on bond during the

15  pendency of removal proceedings." *Id.* As Petitioner recently received an individualized

16  bond hearing at which the IJ determined the Government had carried its burden of proof,

17  Respondents are likely to show that "the existing agency procedures sufficiently protected

18  [Petitioner's] liberty interest and mitigated the risk of erroneous deprivation." *Id.* at 1208.

19      As presented, Petitioner has also not shown that he is likely to succeed on the

20  merits of a substantive due process claim. As a matter of substantive due process, "an

21  individual detained under civil process . . . cannot be subjected to conditions that amount

22  to punishment." *Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) (internal quotation

23  marks omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 694 (2001) ("[P]unitive

24  measures [can] not be imposed upon aliens ordered removed because 'all persons within

25  the territory of the United States are entitled to the protection' of the Constitution"

26  (quoting *Wong Wing v. United States*, 163 U.S 228, 238 (1896))). "A due process

27  violation occurs when detention becomes punitive rather than regulatory, meaning there

28  is no regulatory purpose that can rationally be assigned to the detention or the detention

appears excessive in relation to its regulatory purpose." *United States v. Torres*, 995 F.3d 695, 708 (9th Cir. 2021). In light of the Court's discussion above, addressing the Government's interest in detaining aliens pending removal, and the absence of any evidence to show that the IJ's flight risk determination was pretextual, Petitioner has not shown that the purpose of his continued confinement is punitive, rather than regulatory.[3] As such, Petitioner has not shown that he is likely to succeed on the merits of his claim under the Due Process Clause.

Because Petitioner's likelihood of success on the merits constitutes "a threshold inquiry" for purposes of preliminary injunctive relief and Petitioner has not shown that he

---

[3] As presented, Petitioner has also not shown that he is likely to succeed on his claim based on the conditions of his confinement. In *Jones v. Blanas*, a suit for damages under 42 U.S.C. § 1983, the Ninth Circuit held that "a presumption of punitive conditions arises where [an] individual is detained under conditions identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held, or where the individual is detained under conditions more restrictive than those he or she would face upon commitment." *Jones*, 393 F.3d at 932. However, in *Fraihat v. ICE*, the Ninth Circuit noted that there is no support in Ninth Circuit precedent "for applying *Jones*'s presumption about comparative 'conditions' of confinement to the government's continued *ability* to confine persons pursuant to lawful authority." 16 F.4th 613, 649 (9th Cir. 2021). The court in *Fraihat* also distinguished *Jones* on the basis that, in the context of immigration detention, "different government interests are at stake" than in other instances of civil detention. *See id.* As Petitioner has raised no argument for how the Court should consider the conditions of his confinement in assessing his request for release, the Court declines in this order to consider the circumstances under which a court may do so, if ever. *See Pinson v. Carvajal*, 69 F.4th 1059 (9th Cir. 2023) (challenge to conditions of confinement on post-conviction habeas petition did not sound in habeas and were properly dismissed for lack of jurisdiction); *see also Doe v. Becerra*, 723 F. Supp. 3d 688, 692 (N.D. Cal. 2024) (considering conditions of confinement as one of five factors in petition for release from custody under § 1226(c)).

-24-

1   is likely to succeed on the merits of any claim, the Court need not consider the remaining

2   *Winter* factors.[4] *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015).

3   **IV.    CONCLUSION**

4          For the foregoing reasons, the Court DENIES the Application without prejudice.

5          **IT IS SO ORDERED.**

6   DATED:  February 9, 2026

7                                                    _____
                                                    HON. SHERILYN PEACE GARNETT
8                                                    UNITED STATES DISTRICT JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   _____

27   [4] The Court also declines to consider Respondents remaining arguments, including that
     Petitioner failed to comply with the applicable Local Rules when filing the Application.
28   *See* (Opp. at 12–13).